# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# EL PASO DIVISION

| | | |
|---|---|---|
| **MICHELLE HERNANDEZ**, | § § § | |
| Plaintiff, | § § | |
| v. | § § | No. EP-19-CV-260-DB |
| **EMPIRE TODAY, LLC**, | § § § | |
| Defendant. | § | |

## PLAINTIFF'S APPENDIX TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**TO THE HON. DAVID BRIONES, SENIOR UNITED STATES DISTRICT JUDGE:**

Comes now MICHELLE HERNANDEZ, Plaintiff, and files this Appendix to her Response to Defendant's Motion for Summary Judgment, and would show the following:

### I. Exhibits

Plaintiff attaches the following exhibits in support of Plaintiff's Response to Defendant's Motion for Summary Judgment:

Ex. A:  The declaration of Michelle Hernandez, Plaintiff;

Ex. B:  The declaration of Lisa Lujan;

Ex. C:  Defendant's "Personnel Change Form" related to the termination of Hernandez's employment;

Ex. D:  Pertinent portion of Defendant's "Company Policy Manual;"

Ex. E:  Pertinent portion of Defendant's Answers to Plaintiff's Interrogatories;

Ex. F:  The declaration of Brett Duke, Plaintiff's counsel, to authenticate other exhibits.

Taken as a whole, the evidence raises genuine fact questions for the jury, precluding summary judgment.

### II. Plaintiff's Statement of Relevant Facts.

1. Plaintiff Michelle Hernandez filed this suit against Defendant Empire today for discrimination based on sex and disability, arising from Defendant's adverse employment actions towards her after she informed her supervisor of her pregnancy. (ECF No. 2-1).

2. Hernandez went to work for Empire Today in approximately July 2015. At the end of her employment, her supervisor was Rita Rae. (Ex. A ¶ 2). Before the events giving rise to this suit, Hernandez was a top performer on her team. (Ex. B ¶ 2).

3. In the fall of 2016, Hernandez became pregnant. When Hernandez was about 24 weeks pregnant, the pregnancy was designated a high-risk pregnancy. The pregnancy was high-risk because the baby was retaining too much water, requiring regular monitoring of the baby's condition, and because Hernandez was diagnosed with gestational diabetes. As the pregnancy progressed, Hernandez developed high blood pressure, fatigue, and dizziness. (Ex. A ¶ 3).

4. The high-risk pregnancy interfered with Hernandez's ability to perform major life activities. Specifically, she would get dizzy, feel fatigued and tired, and would need to keep her feet elevated for the blood pressure. As a result, she was substantially impaired in her ability to remain sitting or standing. She was able to work, but needed to avoid stress, which included not working extra hours. She needed to see and be monitored by her doctor twice a week and had to have an ultrasound examination performed twice a week. (Ex. A ¶ 4).

5. When Hernandez was about 26 weeks pregnant, which was in about March 2017, she notified Rae of her high-risk pregnancy. The high-risk nature of the pregnancy required frequent medical visits and monitoring of the fetus. Hernandez asked Rae to allow her time off to visit a physician two days per week, including allowing her to either miss the whole workday or miss half a day of work on the dates of her medical visits. (Ex. A ¶ 5).

6. Rae responded negatively when Hernandez told her she was pregnant. She told Hernandez that she had three miscarriages in her life and could not have children, so she was not sympathetic to her condition. (Ex. A ¶ 6).

7. Defendant's written company policy states that it will make accommodations for pregnancy, including the possibility of a part-time or modified work schedule. (Ex. D pp. 000179-80). Nonetheless, Rae told Hernandez that Empire Today would not accommodate her request for time off to visit the doctor. (Ex. A ¶ 7).

8. At about the same time, Hernandez notified Fernando Garcia, Empire Today's on-site human resources officer, of her high-risk pregnancy. Hernandez asked Garcia to accommodate her pregnancy by allowing her take time off to visit a physician two days per week, including allowing her to either miss the whole work day or miss half a day of work on the dates of her visits. Garcia approved the time off and said to let her supervisor know. Hernandez told him that Rae had already refused to allow her those visits, but he said "not to worry as he is ok with it." He instructed her to send the doctor's notes to HR. (Ex. A ¶ 8).

9. When Hernandez visited the doctor during her pregnancy, she would provide her doctors' notes to Empire Today's HR office. These notes described her condition and need for accommodation. (Ex. A ¶ 9).

10. Immediately after Hernandez informed Rae of her pregnancy and need for accommodation, Rae became hostile, aggressive, abusive, harassing on an everyday basis. (Ex. A ¶ 10).

11. In particular, prior to informing Rae of her high-risk pregnancy and need for accommodations, Hernandez had not been harassed or had her work micromanaged. Within a week after telling Rae of her high-risk pregnancy and need for accommodations, Rae began harassing Hernandez on a daily basis, micromanaging her work on a daily basis, frequently calling her to her office, and disciplining her. Rae would constantly come to her work station and look at her negatively. She took actions to make her work environment harassing and more burdensome, including requiring more hours; extra monitoring, scrutinizing her internet usage and emails; constant meetings and calling her to her office about her doctor's notes; and harassing and yelling at her for using the office internet to send emails to HR including doctor's notes, despite the fact that the HR office instructed her to send the doctor's notes. (Ex. A ¶ 11). Coworkers witnessed that Rae

was upset and annoyed that Hernandez was going to doctor's appointments. They observed Rae harass Hernandez constantly over going to the doctor, and discriminate against and harass Hernandez because of her pregnancy. (Ex. B ¶ 3).

12. Approximately a week after Hernandez hold her of her pregnancy, Rae instructed her that Hernandez would be required to work mandatory overtime. Because Hernandez was a part-time employee, mandatory overtime was not part of her job duties. (Ex. A ¶ 12).

13. Hernandez informed Rae that she could not work mandatory overtime due to her high-risk pregnancy, and she actually needed to work fewer hours, not more hours. She offered to make up the time she missed to go to the doctor by coming on Saturday, but under no circumstance could she work overtime. Rae reacted angrily and appeared upset. She told her that being pregnant was not an excuse for failing to work overtime. She threatened to "eliminate" the position of part-time agent. She told Hernandez, "either work OT or you are fired." She also e-mailed her frequently to tell her to work overtime, and to state that refusal to work overtime because of children or child situations was unacceptable and would not be allowed. (Ex. A ¶ 13).

14. In addition, shortly after Hernandez advised Rae of the pregnancy and need for accommodation, Rae dramatically raised her sales quotas. She knew that Hernandez could not meet the higher quotas while working the reduced hours made necessary by her high-risk pregnancy. She did so in a transparent attempt to create a justification to terminate her. (Ex. A ¶ 14).

15. Rae threatened to demote Hernandez from her position because of her need to obtain medical care for her pregnancy. She threatened to demote her to the position of customer service representative, a position which earned lower wages and did not earn commissions. (Ex. A ¶ 15).

16. Rae asked Hernandez to resign from her job, telling her that "child issues" were not an excuse. She told her to quit so Hernandez could deal with her pregnancy. She told her that

because of her high-risk pregnancy, it would be best if Hernandez quit because, she said, Hernandez clearly couldn't handle the position. Hernandez refused to quit because she needed the job. Hernandez pointed out to Rae that her high-risk pregnancy was not affecting her job or her sales while at work; it was only affecting the number of hours she could work. (Ex. A ¶ 16).

17. Hernandez performed an online search for information related to FMLA time off for pregnancy. Rae called her into her office and berated her for using her time at work to inquire about leave related to pregnancy. She also told Hernandez she had no business taking requests for family medical leave to HR. She had prepared a disciplinary write-up which she showed Hernandez, and asked her to sign. Hernandez refused to sign it because she thought was wrong and felt that her request for leave was related to her work. (Ex. A ¶ 17).

18. Rae also threatened to terminate Hernandez because of her pregnancy. In about March 2017, Ms. Rae called Hernandez into her office and also told her that she was "automatically terminated" when she did not show up for overtime, despite the fact that she knew in advance that Hernandez could not work overtime because of her high-risk pregnancy. Hernandez pointed out to her that a male employee, Pablo (last name unknown), had not shown up for overtime work or called in, and he had not been fired. Rae then withdrew the termination. (Ex. A ¶ 18).

19. Rae's negative conduct towards Hernandez was pervasive and occurred on a daily or near-daily basis. She would call her into her office two or more times a week, and would also come to her work station, to confront and threaten her. Rae would come by her work station daily, berating her and telling her that she would demote her; that she was not doing a good job; that children needs are not excused; that she needed to resign and deal with her pregnancy; that she would be demoted; and that she needed to meet new quotas. Hernandez would become very upset, and this caused her stress level to worsen and blood pressure to become elevated. (Ex. A ¶ 19).

5

20. Hernandez considered Rae's conduct hostile and abusive, and any reasonable person in her position would have found it hostile and abusive. (Ex. A ¶ 19).

21. Hernandez went to Garcia and complained about Rae's discrimination, harassment, daily abuse, calling her to the office, and threatening to demote or terminate her. Hernandez informed Garcia that Rae had commented to her about her miscarriages and not having children and therefore not having sympathy for her. Hernandez told him that she believed she was being discriminated against because of her high-risk pregnancy and disability. (Ex. A ¶ 21).

22. Mr. Garcia's response to Hernandez's complaints was to tell her to ignore Rae and "that is just the way she is." He told her to not worry and that he would talk to her. However, nothing happened or changed in terms of Rae's behavior. To the contrary, she got worse. (Ex. A ¶ 22).

23. After Hernandez made her several reports to Garcia, Rae continued to harass and retaliate against her. Rae called a meeting and told Hernandez that she did not want her to go to Garcia, and that if she did, she was violating the chain of command and could be fired for it. Rae also told her that it was the company's policy that any issues to go to her and not Garcia. Hernandez was afraid to respond or say anything, so she did not respond to her at that time. (Ex. A ¶ 23).

24. Rae then issued several successive disciplinary actions to her, and asked her to sign them. The disciplinary actions which she prepared included disciplining her for sending doctor's notes to the HR office; for not meeting her drastically increased sales quotas; and for looking up FMLA on the internet. Hernandez refused to sign the third disciplinary action because it was harassment and retaliatory. Rae told her, "You are easily replaceable! The door is right there," pointing at the door. (Ex. A ¶ 24).

25.     On or about April 2017, because the harassment not getting better, and in fact, was getting worse, Hernandez went back to Garcia and asked him to allow her to file an official written report against Rae for discrimination and retaliation. He said that she needed to calm down and ignore her. Thereafter, Hernandez called and emailed Garcia to check on the status on the official discrimination complaint. Hernandez called him about three times before her pregnancy leave to inquire on the status of the official report against Rae, but received no response. (Ex. A ¶ 25). Unfortunately, it was the practice of Defendant's HR office to ignore complaints of discrimination and policy violations. (Ex. B ¶ 6).

26.     Defendant's written policy represents that it will accommodate employees' pregnancy by providing leave. (Ex. D pp. 179-80). Before her child was born, Hernandez requested family medical leave. Garcia told her that to apply for family medical leave, she needed to talk to Carmen Villagrana of the HR department in Chicago. Hernandez spoke with Villagrana, and advised her of her pregnancy, and her need for leave because of the high risk and complications with the baby. Hernandez informed her she was requesting 60 to 90 days of leave. She needed more than 30 days of leave because the gestational diabetes and high blood pressure continued for a period of time after the birth, and because the child's condition at birth was going to require special feeding through a stomach tube. (Ex. A ¶ 26).

27.     Villagrana and Garcia told her that her request for FMLA leave was approved. Hernandez also filled out leave paperwork and emailed it to Villagrana. Villagrana assured her that the leave was approved, and Hernandez would have her job upon her return. She also advised that the leave was not paid, which Hernandez agreed and understood. Hernandez was told to return on or about August 21, 2017. (Ex. A ¶ 27).

28. Hernandez was expecting to return to work on or about August 21, 2017. Hernandez called Empire Today about a week in advance, to advise that she would be returning as planned. She spoke with Garcia, who said "we look forward to seeing you next week." (Ex. A ¶ 28).

29. However, Garcia called back about 10 minutes after they spoke and apologized and said: "we have made a mistake, I didn't realize you were terminated." When Hernandez asked why, he said he was not sure but that she should be eligible for rehire, and he would hire her back. (Ex. A ¶ 29).

30. Garcia then told her that she had not been approved for FMLA leave. This was different from what he and Villagrana told her before, and it was the first time Hernandez was told her leave was not approved. (Ex. A ¶ 29). This was also inconsistent with Defendant's statements to its other employees, who were told that Hernandez was out on FMLA leave. (Ex. B ¶ 4). Defendant seems to claim in its summary-judgment motion that Hernandez did not provide it with medical documentation regarding her leave, but the document attached by Defendant as its exhibit A-4 reflects that "We currently show that your physician has advised you will need to continue to be out from work until 8/21/17." (ECF No. 36-1 p. 15).

31. Twenty minutes after that conversation, Garcia called Hernandez back again, and told her that she had been designated as non-rehirable. Garcia told her that it was Rae who decided to terminate her and who decided to designate her as non-rehirable. When Hernandez asked why, he told her he did not know and there was no reason. He stated he would transfer her call to Rae, but Rae refused to take the call. (Ex. A ¶ 30).

32. Defendant claims that Hernandez was terminated for "abandonment of her position" because she did not return to work after a scheduled 30-day leave period. This claim is false. Hernandez had been granted leave up until August 21. She called before the end of that period to

schedule her return to work. However, she was told when she called that she had already been terminated. (Ex. A ¶ 31).

33. Additionally, Defendant's personnel change form documenting the termination includes check-boxes to indicate the "Reason for termination." One of the check-boxes is for "Job Abandonment," but that box is not checked. Instead, Defendant checked the box for "Other." (Ex. C). Defendant has provided no reason for this discrepancy.

34. Contrary to Garcia's statements to Hernandez that he was looking forward to her return, that Rae had decided to terminate her, and that he did not know she had been terminated, Defendant now claims that Garcia participated in the decision to terminate Hernandez, and that Rae was not involved in the decision. However, Defendant has conceded that Rae had to "sign off" on the termination decision. (Ex. E, Answer No. 5).

35. Defendant's purported explanation for the termination is also contradicted by its decision to classify her as "non-rehirable." Garcia's statement to Hernandez that Rae decided to classify her as non-rehirable is consistent with Defendant's personnel change document, which indicates Hernandez is not eligible for rehire "Per Rita Rae." (Ex. C). But under Defendant's policy, employees are not eligible for rehire "if they were *involuntarily* separated due to poor performance or any type of policy misconduct." (Ex. D p. 000182, Emphasis added). Under Defendant's policy, an employee's failure to return to work when scheduled is "considered job abandonment and considered *voluntary* termination[.]" (Ex. D p. 000201, Emphasis added). The letters upon which Defendant relies – although they are disputed – also state that a failure by Hernandez to return to work would be considered "voluntary resignation." (Def. Ex. A-2, A-3, A-4). Defendant provides no explanation for the decision to classify Hernandez as ineligible for rehire after a termination that

9

would have been, based on its version of the events and under the terms of its own policy, a voluntary resignation.

36. Unlike her decision to designate Hernandez as non-rehirable, Rae designated a non-disabled man, Robert Macias, as rehirable when his employment terminated. Macias should have been designated non-rehirable under Empire Today's policy, because he left his position within 90 days of his start date. Despite this, Rae designated Macias as rehirable and actually rehired him. (Ex. A ¶ 32).

37. After her employment was terminated, Hernandez was replaced by Andre Apperwhite, a non-disabled man. (Ex. A ¶ 33; Ex. B ¶ 5).

38. After Hernandez filed her EEOC charge, she received a telephone call from Garcia. He apologized to her. He stated that Empire Today's action was wrong. He stated that Empire Today should not have terminated her. He apologized for not protecting her from Rae in the past. He admitted that Rae's actions were wrong and stated that Rae had been terminated for the harassment. (Ex. A ¶ 34).

Based on the facts stated above and the attached summary judgment evidence, and for the reasons stated in Plaintiff's response to Defendant's motion for summary judgment, Defendant's motion should be denied.

                              Respectfully submitted,

                              BRETT DUKE, P.C.
                              6350 Escondido Dr., Ste. A14
                              El Paso, Texas 79912
                              (915) 875-0003
                              (915) 875-0004 (facsimile)
                              brettduke@brettduke.com

                              ***/s/ Brett Duke***
                              Brett Duke
                              Texas Bar No. 24012559

And

LAW FIRM OF DANIELA LABINOTI, P.C.
707 Myrtle Ave.
El Paso, Texas 79901
(915) 581-4600
(915) 581-4605
Daniela@LabinotiLaw.com

*/s/ Daniela Labinoti*
DANIELA LABINOTI
Texas Bar No. 24050900

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the clerk using the CM/ECF system, which will send notification of such filing to all counsel.

*/s/ Brett Duke*
Brett Duke