## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| MICHELLE HERNANDEZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. EP-19-CV-260-DB |
| | § | |
| EMPIRE TODAY, LLC, | § | |
| | § | |
| Defendant. | § | |

### DECLARATION OF MICHELLE HERNANDEZ

I, MICHELLE HERNANDEZ, declare as follows:

1.     My name is Michelle Hernandez.  I am the Plaintiff in the above-styled case.  I am over 21 years of age, of sound mind, and capable of making this statement.  I have personal knowledge of the matters stated herein because this declaration describes facts and events that I personally experienced.  Every statement herein is true and correct.

2.     I was previously employed by Empire Today, LLC.  I went to work for Empire Today in approximately July 2015.  At the end of my employment, my supervisor was Rita Rae.

3.     In the fall of 2016, I became pregnant.  When I was about 24 weeks pregnant, the pregnancy was designated a high-risk pregnancy.  The pregnancy was high-risk because the baby was retaining too much water, requiring regular monitoring of the baby's condition, and because I was diagnosed with gestational diabetes.  As the pregnancy progressed, I developed high blood pressure, fatigue, and dizziness.

4.     The high-risk pregnancy interfered with my ability to perform major life activities.  Specifically, I would get dizzy, feel fatigued and tired, and would need to keep my feet elevated for the blood pressure.  As a result, I was substantially impaired in my ability to

remain sitting or standing.  I was able to work, but I needed to avoid stress, which included not working extra hours.  I needed to see and be monitored by my doctor twice a week and had to have an ultrasound examination performed twice a week.

5.      When I was about 26 weeks pregnant, I notified Ms. Rae of my high-risk pregnancy.  The high-risk nature of the pregnancy required frequent medical visits and monitoring of the fetus.  I asked her to allow me time off to visit a physician two days per week, including allowing me to either miss the whole workday or miss half a day of work on the dates of my medical visits.

6.      Ms. Rae responded negatively when I told her I was pregnant.  She told me that she had three miscarriages in her life and could not have children, so she was not really too sympathetic to my condition.

7.      Ms. Rae told me that Empire Today would not accommodate my request for time off to visit the doctor.

8.      At about the same time, I notified Fernando Garcia, Empire Today's on-site human resources officer, of my high-risk pregnancy.  I asked Mr. Garcia to accommodate my pregnancy by allowing me take time off to visit a physician two days per week, including allowing me to either miss the whole workday or miss half a day of work on the dates of my visits.  Mr. Garcia approved the time off and said to let my supervisor know.  I told him that Ms. Rae had already refused to allow me those visits, but he said, "not to worry as he is ok with it".  He instructed me to send the doctor's notes to HR.

9.      When I visited the doctor during my pregnancy, I would provide my doctors' notes to Empire Today's HR office.   These notes described my condition and need for accommodation.

10.      Immediately after I informed Ms. Rae of my pregnancy and need for accommodation, she became hostile, aggressive, abusive, harassing on an everyday basis.

11.      In particular, prior to informing Ms. Rae of my high-risk pregnancy and need for accommodations, I had not been harassed or had by work micromanaged.  Within a week after telling Ms. Rae of my high-risk pregnancy and need for accommodations, she began harassing me on a daily basis, micromanaging my work on a daily basis, frequently calling me to her office, and disciplining me.   She would constantly come to my work station and look at me negatively.   She took actions to make my work environment harassing and more burdensome, including requiring more hours; extra monitoring, scrutinizing my internet usage and emails; constant meetings and calling me to her office about my doctor's notes; and harassing and yelling at me for using the office internet to send emails to HR including doctor's notes, despite the fact that the HR office instructed me to send the doctor's notes.

12.      Approximately a week after I hold her of my pregnancy, Ms. Rae instructed me that I would be required to work mandatory overtime.  Because I was a part-time employee, mandatory overtime was not part of my job duties.

13.      I informed Ms. Rae that I could not work mandatory overtime due to my high-risk pregnancy, and I actually needed to work fewer hours, not more hours.  I offered to make up the time I missed to go to the doctor by coming on Saturday, but under no circumstance could I work overtime.  Ms. Rae reacted angrily and appeared upset.  She told me that being pregnant was not

an excuse for failing to work overtime. She threatened to "eliminate" the position of part-time agent. She told me, "either work OT or you are fired." She also e-mailed me frequently to tell me to work overtime, and to state that refusal to work overtime because of children or child situations was unacceptable and would not be allowed.

14.     In addition, shortly after I advised Ms. Rae of the pregnancy and need for accommodation, she dramatically raised my sales quotas. She knew that I could not meet the higher quotas while working the reduced hours made necessary by my high-risk pregnancy. She did so in a transparent attempt to create a justification to terminate me.

15.     Ms. Rae threatened to demote me from my position because of my need to obtain medical care for my pregnancy. She threatened to demote me to the position of customer service representative, a position which earned lower wages and did not earn commissions.

16.     Ms. Rae asked me to resign from my job, telling me that "child issues" were not an excuse. She told me to quit so I could deal with my pregnancy. She told me that because of my high-risk pregnancy, it would be best if I quit because, she said, I clearly couldn't handle the position. I refused to quit because I needed the job. I pointed out to Ms. Rae that my high-risk pregnancy was not affecting my job or my sales while at work; it was only affecting the number of hours I could work.

17.     I performed an online search for information related to FMLA time off for pregnancy. Ms. Rae called me into her office and berated me for using my time at work to inquire about leave related to pregnancy. She also told me I had no business taking requests for family medical leave to HR. She had prepared a disciplinary write-up which she showed me and

4

asked me to sign.  I refused to sign it because I thought was wrong and I felt that my request for leave was related to my work.

18.     Ms. Rae also threatened to terminate me because of my pregnancy.  In about March 2017, Ms. Ray called me in her office and also told me that I was "automatically terminated" when I did not show up for overtime, despite the fact that she knew in advance that I could not work overtime because of my high-risk pregnancy.  I pointed out to her that a male employee, Pablo (last name unknown), had not shown up for overtime work or called in, and he had not been fired.  She then withdrew the termination.

19.     Ms. Rae's negative conduct towards me was pervasive and occurred on a daily or near-daily basis.  She would call me in her office two or times a week, and would also come to my workstation, to confront and threaten me.  Also, she would come by my station daily berating me and telling me that she would demote me; that I was not doing a good job; that children needs are not excused; that I needed to resign and deal with my pregnancy; that I would be demoted; that I needed to meet new quotas.  I would be very upset, and this caused my stress level to worsen and blood pressure to become elevated.

20.     I considered Ms. Rae's conduct hostile and abusive, and any reasonable person in my position would have found it hostile and abusive.

21.     I went to Mr. Garcia and complained about Ms. Rae's discrimination, harassment, daily abuse, calling me to the office, and threatening to demote or terminate me.  I informed Mr. Garcia that Ms. Rae had commented to me about her miscarriages and not having children and therefore not having sympathy for me.  I told him that I believed I was being discriminated because of my high-risk pregnancy and disability.

22.     Mr. Garcia's response to my complaints was to tell me to ignore Ms. Rae and "that is just the way she is." He told me to not worry and that he will talk to her. However, nothing happened or changed in terms of Ms. Rae's behavior. To the contrary, she got worse.

23.     After I made my several reports to Mr. Garcia, Ms. Rae continued to harass and retaliate against me. Ms. Rae called a meeting and told me that she did not want me to go to Mr. Garcia, and that if I did, I was violating the chain of command and I could be fired for it. Ms. Rae also told me that it was company's policy that any issues to go to her and not Mr. Garcia. I was afraid to respond or say anything, so I did not respond to her at that time.

24.     Ms. Rae then issued several successive disciplinary actions to me, and asked me to sign them. The disciplinary actions which she prepared included disciplining me for sending doctor's notes to the HR office; for not meeting her drastically increased sales quotas; and for looking up FMLA on the internet. I refused to sign the third disciplinary action because it was harassment and retaliatory. Ms. Rae told me, "You are easily replaceable! The door is right there," pointing at the door.

25.     On or about April 2017, because the harassment not getting better, and in fact, was getting worse, I went back to Mr. Garcia and asked him to allow me to file an official written report against Ms. Rae for discrimination and retaliation. He said that I needed to calm down and ignore her. Thereafter, I called and emailed Mr. Garcia to check on the status on the official discrimination complaint. I called him about three times before my pregnancy leave to inquire on the status of the official report against Mr. Rae, but received no response.

26.     Before my child was born, I requested family medical leave. Mr. Garcia told me that to apply for family medical leave, I needed to talk to Carmen Villagrana of the HR

department in Chicago. I spoke with Ms. Villagrana, and advised her of my pregnancy, and my need for leave because of the high risk and complications with the baby. I informed her I was requesting 60 to 90 days of leave. I needed more than 30 days of leave because the gestational diabetes and high blood pressure continued for a period of time after the birth, and because the child's condition at birth was going to require special feeding through a stomach tube.

27.     Ms. Villagrana and Mr. Garcia told me that my request for FMLA leave was approved. I also filled out leave paperwork and emailed to Ms. Villagrana. She assured me that the leave was approved, and I would have my job upon my return. She also advised that the leave was not paid, which I agreed and understood. I was told to return on or about August 21, 2017.

28.     I was expecting to return to work on or about August 21, 2017. I called Empire Today about a week in advance, to advise that I would be returning as planned. I spoke with Mr. Garcia, who said "we look forward to seeing you next week."

29.     However, Mr. Garcia called back about 10 minutes after we spoke and apologized and said: "we have made a mistake, I didn't realize you were terminated." When I asked why, he said he was not sure but that I should be eligible for rehire, and he would hire me back. Mr. Garcia then told me that I had not been approved for FMLA leave. This was different from what he and Ms. Villagrana told me before, and it was the first time I was told my leave was not approved.

30.     Twenty minutes after that conversation, Mr. Garcia called me back again, and told me that I had been designated as non-rehirable. Mr. Garcia told me that it was Ms. Rae who decided to terminate me and who decided to designate me as non-rehirable. When I asked why,

7

he told me he did not know and there was no reason. He stated he would transfer my call to Ms. Rae, but she refused to take the call.

31.     The claim that I was terminated for failing to return to work when scheduled is false. I had been granted leave up until August 21. I called before the end of that period to schedule my return to work. However, I was told when I called that I had already been terminated.

32.     Unlike her decision to designate me as non-rehirable, Ms. Rae designated a non-disabled man, Robert Macias, as rehirable when his employment terminated. Mr. Macias should have been designated non-rehirable under Empire Today's policy, because he left his position within 90 days of his start date. Despite this, Ms. Rae designated Mr. Macias as rehirable and actually rehired him.

33.     While on leave and when terminated, I was replaced by males that had no disability. More particularly, Andre Apperwhite, a non-disabled man, replaced me after I was terminated. I acquired this information from employees that still worked there after I was terminated, including but not limited to Lisa Lujan.

34.     After I filed my EEOC charge, I received a telephone call from Mr. Garcia. He apologized to me. He stated that Empire Today's action was wrong. He stated that Empire Today should not have terminated me. He apologized for not protecting me from Ms. Rae in the past. He admitted that Ms. Rae's actions were wrong and stated that Ms. Rae had been terminated for the harassment.

8

I declare under penalty of perjury that the foregoing is true and correct.

Date:   October   2nd  , 2020.

Michelle Hernandez

SWORN TO AND SUBSCRIBED before me on the 2nd day of October,  2020 by Michelle Hernandez.

VERONICA DURAN
Notary Public, State of Texas
Comm. Expires 12-04-2023
Notary ID 128650814

Notary Public in and for The State of Texas

My Commission Expires:

12. 04. 2023

9